IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 23, 2019, at Knoxville

**STATE OF TENNESSEE v. RANDY CHAMPION**

**Appeal from the Criminal Court for Shelby County**
**No. 15-05137        Paula L. Skahan, Judge**
_____

**No. W2018-01393-CCA-R3-CD**
_____

A Shelby County jury convicted the Defendant, Randy Champion, of one count of especially aggravated robbery, two counts of attempt to commit second degree murder, two counts of employment of a firearm, one count of attempt to commit especially aggravated robbery, and one count of attempt to commit aggravated robbery. For these convictions, the trial court ordered an effective sentence of twenty-four years in the Tennessee Department of Correction. On appeal, the Defendant asserts that the evidence is insufficient to prove his identity as a perpetrator of the offenses, that the trial court improperly denied his motion for severance, and that the State presented inconsistent theories of prosecution at trial. After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT H. MONTGOMERY, JR., JJ., joined.

Jessica L. Gillentine, Bartlett, Tennessee, for the appellant, Randy Champion.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Pam Stark and Gavin Smith, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises out of a robbery, shooting, and stabbing in Shelby County, Tennessee. A Shelby County grand jury indicted the Defendant and two co-defendants, Marterius O'Neal and Anthony Bracey, for one count of especially aggravated robbery, two counts of attempt to commit second-degree murder, two counts of employment of a

firearm, one count of attempt to commit especially aggravated robbery, and one count of attempt to commit aggravated robbery. The Defendant and Anthony Bracey, the Defendant's brother, were tried together. We summarize the evidence presented at trial as follows:

Rogelio Rodriguez sat on the front porch of his home on the night of September 5, 2014, on Gerald Avenue in Shelby County, Tennessee, with his brother, Rolando Rodriquez.[1] At around 7:00 p.m., his other brother Ramiro Rodriguez arrived and joined his brothers, talking about work. As the men talked, two "[t]hin [men with] black skin" approached, and one of the men fired a gun. The man with the gun pointed the gun at Rogelio while trying to take a wallet from Rolando. The man fired his gun again, this time at Rogelio. Rogelio was transported to the hospital where he underwent surgery for a gunshot wound to his stomach and remained in the hospital for a week. At the time of these events, Rogelio had a cell phone lying next to where he was seated on the porch. After the incident, the phone was no longer on the porch.

Rolando and Ramiro both lived with their brother Rogelio and his family on Gerald Avenue in September 2014. On the night of September 5, Rolando also heard a gunshot and then saw a person approaching him. The man, who was armed, attempted to take Rolando's wallet. Rolando was fearful of the man. As the man tried to take Rolando's wallet, he fired a second and third shot, one of which struck Rogelio. The other man had a knife and used it to cut Ramiro.

Ramiro described the events of the night similarly to his brothers. He added that while the man brandishing the gun attempted to take Rolando's wallet, the other man, who was holding a knife, asked Ramiro for his wallet. Ramiro complied and gave the man his wallet; however, the man still "stuck [him] with [the] knife." The man continued stabbing at Ramiro, so Ramiro ran around a truck parked in the driveway with the man in pursuit. As Ramiro fled from the man with the knife, he observed another man, shorter and heavier than the first two, standing in the neighbor's yard waiting for the two men who had approached him and his brothers. He also heard additional gunfire and then observed the two men fleeing. Ramiro realized that the man who held the gun had run out of ammunition, so he began to chase him in an attempt to detain him for the police. When he neared the men, they told him to leave; however, Ramiro asked the men to return his immigration paperwork from his wallet to him.

Ramiro recalled that the three men, who wore dark clothing, stood in front of him, and the man with the gun passed it to the man who had held the knife. The man, who

---

[1] For purposes of clarity, we will refer to the victims by their first name due to the shared last name.

initially had the knife but now held the gun, loaded the gun and then fired it. Ramiro fled.

Rosalinda Torres, Rogelio's wife, was also at the Gerald Avenue residence on September 5, 2014, with her three daughters, ages thirteen, nine, and seven. She recalled that her husband and his two brothers were outside in front of the house. Shortly after she and her daughters had come inside the house from outside, she heard a gunshot. She gathered the girls in the back room and then went to look out a window facing the front of the house. As she looked out the window she saw a tall, thin, black man pointing a gun at Rogelio. She returned to the room where she had gathered her daughters and called 911 with no one answering the call. She returned to the window and saw her brother-in-law helping Rogelio, who was injured. Ms. Torres went outside and stayed with Rogelio until the ambulance arrived. Ms. Torres confirmed that Rogelio's cell phone had been sitting next to him on the porch but was gone when she returned to the porch after Rogelio was shot. The phone was never returned to Rogelio.

Philip Perez, a Memphis Police Department ("MPD") officer, reported to the crime scene and found two injured men: one had been shot and the other stabbed. Ramiro showed the officer the direction he had chased the suspects. The suspects had run toward a drainage ditch with a fence around it. When Officer Perez approached the drainage ditch he found clothing outside of the fence. He learned from other sources that the three individuals had jumped over the fence and into the ditch, leaving behind the clothing found outside of the fence.

James Smith, an MPD crime scene investigator, photographed the scene. He found a projectile/bullet at the scene. He also reported to Weymouth Cove, where a pinstripe baseball cap with a Batman logo, a black T-shirt, and a black and green baseball cap with the word "Dub" were found.

Cervinia Braswell, a Tennessee Bureau of Investigation special agent, testified as an expert witness in the field of ballistic and firearm identification. She identified the bullet/projectile recovered at the crime scene as a .38 caliber bullet, "consistent with [a] .38 Special or .357 magnum bullet," noting that a .38 Special bullet can be fired from either a .38 Special revolver or a .357 revolver.

The State informed the trial court that co-defendant Bracey, acting pro se, wanted to recall Ramiro. During this discussion, co-defendant Bracey informed the trial court that he no longer wanted to proceed pro se but that he wanted representation. The trial court asked "elbow counsel" if he was ready to proceed as counsel, and "elbow counsel" indicated that he would need a continuance. The trial court declared a mistrial as to co-defendant Bracey. The Defendant's attorney then asked for a severance, and the trial

court granted "an automatic severance." The Defendant's attorney conveyed to the trial court the Defendant's "wishes to go forward." The trial court informed the jury of the change as follows:

> While you were out we had some legal issues going on and [co-defendant] Bracey changed his mind and decided he wanted his elbow counsel to represent him. So his attorney now needs more time to prepare to represent [co-defendant] Bracey. So I have severed them out of this trial. And we're going to proceed with [the Defendant's] case only.

Austin Yewell testified that he was "long time friends" with the Defendant and Marterius O'Neal. Mr. Yewell also knew co-defendant Bracey. Mr. Yewell confirmed that he had owned a .38 caliber revolver and that the last time he had seen the gun was when he gave it to the Defendant in September 2014. Mr. Yewell gave the Defendant the revolver "[t]o rob people," specifically Hispanic people. Mr. Yewell would loan the Defendant his revolver and receive a portion of the proceeds in return.

Jesus Perea, an MPD officer, was assigned to a task force that investigated a "rash" of robberies targeted at Hispanics. Officer Perea took statements from the three victims involved in this case. During the course of the investigation, Officer Perea also spoke with Marterius O'Neal, Austin Yewell, and Anthony Bracey. As a result of information he learned during these interviews, Officer Perea began reviewing Facebook accounts and observed many photographs of the Defendant wearing bandannas and one of him wearing a Batman hat that looked like the one recovered in this case. Consequently, he spoke with the Defendant about these crimes. Officer Perea identified the Defendant's statement. The statement reads in part:

> We was at the house and shit and my brother talked to this girl named Boo. I don't know her real name. Anthony Bracey wanted me to walk to her house with him. Me, my brother, and Marterius O'Neal started walking over there. We got half way over there and me and Marterius seen the Mexicans. We decided to rob them so we told my brother that we was fina [sic] rob them and he said go ahead im a [sic] keep going to my girl house. We walked around the block like 3 times. The third time we decided to gone head do it [sic]. I saw 2 Mexicans on the porch and one Mexican on the truck. Me and Marterius ran up on them. I fired one shot in the air and one of the Mexicans moved. I had two Mexicans in front of me and Marterius had the other one in front of him. I told them not to move and I fired one more shot. After that I got one Mexican out the chair and put him on the ground. I looked up and I saw Marterius running after the other one. So I was left with the 2 Mexicans on the porch. I had my hand in the one

guys pocket to get his wallet and the other guy got up and charged me. We started tussling for a minute and the gun had went off. I took off running towards the street. Then I started walking with O'[N]eal and he tapped me on the shoulder and told me to run, so I did. I seen a Mexican chasing us. At this point we caught up to where my brother was. The Mexican caught up with us and wanted his ID. Marterius told him we dropped his ID. The Hispanic guy still followed us. My brother was like what the [f***], and told him they told you they dropped your ID, main damn. My brother walked towards and the Hispanic guy backed up. My brother turned around and we all started running. We ran towards the ditch and I dropped my hat. We ran in the ditch and we called up Ced and he picked us up. We drove to McDonalds on Jackson Ave.

The Defendant also admitted to dropping an "all-black hat with a yellow Batman Symbol" as they fled the crime scene. The Defendant identified Austin Yewell as the owner of the gun. He denied taking anything from the victims but indicated that Marterius O'Neal had taken something.

Officer Perea identified two photographic line-ups. A photograph of Marterius O'Neal was circled on both line-ups and identified as the person with the knife. He identified another photographic line-up that had a photograph of Anthony Bracey. Handwritten on the document was, "this is the person that shot at me and pointed a pistol at me." Officer Perea confirmed that the victims were never shown a photographic lineup of the Defendant. Having spoken with all three men, Officer Perea said he would describe Marterius O'Neal and the Defendant as "slender" and Anthony Bracey as "thicker."

Based upon this evidence, the jury convicted the Defendant of one count of especially aggravated robbery, two counts of attempt to commit second degree murder, two counts of employment of a firearm, one count of attempt to commit especially aggravated robbery, and one count of attempt to commit aggravated robbery and the trial court sentenced him to serve twenty-four years in the Department of Correction. It is from these judgments that the Defendant appeals.

## II. Analysis

On appeal, the Defendant asserts that: the evidence is insufficient to identify him as a perpetrator of the offenses, the trial court improperly denied his motion for severance, and the State presented inconsistent theories of prosecution at trial.

### A. Sufficiency of the Evidence

The Defendant asserts that the evidence is insufficient to support his conviction for especially aggravated robbery and "criminal attempt first degree murder." Specifically, he argues that his identity as the shooter was not sufficiently established. As the State correctly notes, the Defendant was not convicted of attempt to commit first degree murder but rather one count of attempt to commit second degree murder of Ramiro and one count of attempt to commit second degree murder of Rogelio. As such, we will review the Defendant's convictions for especially aggravated robbery and attempt to commit second degree murder.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

Especially aggravated robbery is robbery as defined in Tennessee Code Annotated § 39-13-401 "[a]ccomplished with a deadly weapon; and . . . [w]here the victim suffers serious bodily injury." T.C.A. § 39-13-403(a)(1)-(2) (2014). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a). "Serious bodily injury means bodily injury that involves . . . [a] substantial risk of death; [or] [e]xtreme physical pain." T.C.A. § 39-11-106(a)(34) (2014).

Second degree murder is defined as "the knowing killing of another." T.C.A. § 39-13-210(a)(1). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-302(b). A person attempts to commit second degree murder when he or she acts with intent to knowingly "cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part" or acts knowingly "to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." T.C.A. § 39-12-101(a)(2)-(3).

"A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." T.C.A. § 39-11-401(a). Tennessee Code

Annotated section 39-11-402(2) provides that a person is criminally responsible for the actions of another when, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense . . . ." The person must "'in some way associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree.'" *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting *Hembree v. State*, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976)). The defendant's requisite criminal intent may be inferred from his "presence, companionship, and conduct before and after the offense." *State v. McBee*, 644 S.W.2d 425, 428 (Tenn. Crim. App. 1982). A defendant convicted under a criminal responsibility theory "is guilty in the same degree as the principal who committed the crime" and "is considered to be a principal offender." *Id.* at 171. Criminal responsibility is not a separate crime; rather, it is "solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." *Lemacks*, 996 S.W.2d at 170.

The evidence, viewed in the light most favorable to the State, showed that the Defendant planned to commit a robbery on the night of September 5, 2014. The Defendant borrowed a gun from Mr. Yewell with the agreement that Mr. Yewell would receive some of the proceeds of the robbery in exchange. The Defendant then identified the victims and the Defendant and Mr. O'Neal approached them while they were gathered outside Rogelio's house. Upon approaching Rogelio's house, the Defendant fired the gun and then tried to take Rolando's wallet while Mr. O'Neal demanded and obtained Ramiro's wallet. Mr. O'Neal then stabbed Ramiro once and chased Ramiro with the knife. The Defendant fired the gun at Rogelio, hitting him in the stomach. Due to the injuries sustained from the gunshot wound, Rogelio underwent surgery and remained hospitalized for a week. In addition to Ramiro's wallet being taken, Rogelio's cell phone disappeared during the robbery and was never recovered. This evidence is sufficient to support the jury's finding that the Defendant participated in a robbery of the victims that resulted in shooting and stabbing injuries to Rogelio and Ramiro.

The Defendant arranged to obtain a gun and carried it with him as he executed the robbery. After Rolando did not relinquish his wallet to the Defendant, the Defendant fired the gun at Rogelio's chest area, hitting him in the stomach. The damage sustained by the gunshot wound required surgery and hospitalization. As to the Defendant's assertion that the evidence was insufficient as to his identity, we find there is sufficient evidence to establish the Defendant's identity as the shooter. In the Defendant's statement to police, he identified himself as the shooter and a participant in the robbery. It is a well-established principle of law in this state that a conviction cannot be founded solely upon a defendant's confession, and that there must be some corroborating evidence. *State v. Smith*, 24 S.W.3d 274, 281 (Tenn. 2000) (citing *Ashby v. State*, 139

S.W. 872, 875 (1911)). "A confession may sustain a conviction where there is other evidence sufficient to show the commission of the crime by someone*." Taylor v. State*, 479 S.W.2d 659, 661-62 (Tenn. Crim. App. 1972). "In sum, as long as this very modest corroboration requirement is satisfied, the ultimate truth or falsity of the defendant's confession is a determination left to the jury." *State v. Housler*, 193 S.W.3d 476, 491 (Tenn. 2006). The type of ammunition recovered at the scene, the victims' accounts of the robbery, clothing items found near the scene, and Mr. Yewell's testimony all corroborate the Defendant's confession. A rational jury could conclude beyond a reasonable doubt that shooting a gun at Rogelio's torso would have been reasonably certain to cause death. The evidence supports the conclusion that the Defendant knowingly attempted to kill Rogelio when he shot him in the chest area before fleeing the scene.

As to the conviction for the attempted second degree murder of Ramiro, the evidence showed that the Defendant arranged for a gun, planned a robbery, and identified the victims. Mr. O'Neal along with the Defendant approached the victims and while the Defendant attempted to rob Rolando, Mr. O'Neal robbed Ramiro and then attempted to stab him repeatedly. A rational jury could conclude beyond a reasonable doubt that Mr. O'Neal's repeated attack on Ramiro with a knife would have been reasonably certain to cause death and that the Defendant was criminally responsible for Mr. O'Neal's conduct. The Defendant's presence, participation, and support of the endeavor showed that he furnished substantial assistance in the commission of these felony offenses.

Accordingly, there was sufficient evidence to prove, beyond a reasonable doubt, that the Defendant was a participant in these crimes. He is not entitled to relief as to this issue.

### B. Motion for Severance

The Defendant asserts that the trial court erred when it denied his pre-trial motion for severance. The State responds that the trial court properly denied the motion because the co-defendant Bracey's lack of education or understanding of the law and procedure did not prejudice the Defendant. We agree with the State.

At a pretrial hearing, the Defendant argued that co-defendant Bracey's "lack of legal knowledge" would "affect [the Defendant]'s right to a fair trial," relying on *State v. Carruthers*. The State distinguished co-defendant Bracey's conduct from that of the *pro se* defendant in *Carruthers*. The Defendant also raised concern regarding the possibility of antagonistic defenses. The trial court listened to the arguments, considered the law on severance, and denied the motion. At trial, co-defendant Bracey expressed a desire for appointment of counsel. "Elbow counsel" requested a continuance, and the trial court

granted the continuance.  The Defendant then made a motion for severance on the basis that he wished to proceed to trial, and the trial court granted "an automatic severance."

The law on a motion for severance includes that "[t]he grant or denial of a motion for severance of defendants is a matter that rests within the sound discretion of the trial court, and [the reviewing court] will not disturb the trial court's ruling absent clear abuse of that discretion." *State v. Dotson*, 254 S.W.3d 378, 390 (Tenn. 2008) (citing *Hunter v. State*, 440 S.W.2d 1, 6 (Tenn. 1969); *State v. Burton*, 751 S.W.2d 440, 447 (Tenn. Crim. App. 1988)).  "The test is whether or not the defendant was clearly prejudiced in his defense by being jointly tried with his codefendant."  *State v. Howell*, 34 S.W.3d 484, 491 (Tenn. Crim. App. 2000) (citing *State v. Wiseman*, 643 S.W.2d 354 (Tenn. Crim. App. 1982)); *see also Dotson*, 254 S.W.3d at 390 ("The test to be applied . . . in determining whether the trial court abused its discretion is whether the [d]efendant was 'clearly prejudiced.'") (quoting *Hunter*, 440 S.W.2d at 6).  "The record must demonstrate that 'the defendant was clearly prejudiced to the point that the trial court's discretion ended and the granting of [a] severance became a judicial duty' before an accused is entitled to a reversal of his conviction." *Burton*, 751 S.W.2d at 447 (quoting *Hunter*, 440 S.W.2d at 6); *see also State v. Price*, 46 S.W.3d 785, 803 (Tenn. Crim. App. 2000).

Rule 8 of the Tennessee Rules of Criminal Procedure provides that offenses shall be joined if "the offenses are based upon the same conduct or arise from the same criminal episode."  Tenn. R. Crim. P. 8(a)(1)(A).  The Rule also provides that an indictment may charge two defendants if each "is charged with accountability for each offense included" or if the offenses "were so closely connected in time, place, and occasion that it would be difficult to separate proof of one charge from proof of the others." Tenn. R. Crim. P. 8(c)(1),(3)(B).

After reviewing the record, we conclude that the trial court did not abuse its discretion in initially denying the Defendant's motion for severance.  In reaching this decision, we do not substitute our judgment for that of the trial court.  The offenses in the indictment against the Defendant and co-defendant Bracey arose at the same time and place.  The charged offenses were "closely connected in time, place, and occasion," and "it would [have been] difficult to separate proof of one charge from proof of the others." Tenn. R. Crim. P. 8(c)(3)(B).  The trial court considered the Defendant's requests for severance before the trial, during the trial, and at the hearing on the motion for new trial. The trial court based its decision on the correct legal standard, and its decision was reasonable under the circumstances.  The trial court did not abuse its discretion in denying the Defendant's pre-trial motion for severance based on co-defendant Bracey's *pro se* representation and because the Defendant was not hampered in presenting his defense at the joint trial.

To support his argument that he was clearly prejudiced by the trial court's abuse of discretion, the Defendant offers only conclusory statements about the Defendant's *pro se* representation being prejudicial. The Defendant likens this case to that of *State v. Carruthers*, in which our supreme court reviewed "the effect of one defendant's self-representation on a co-defendant's right to a severance." *Carruthers*, 35 S.W.3d at 553. The court determined that *pro se* litigant Carruthers displayed inappropriate behavior during trial, elicited incriminating testimony, and called an unfavorable witness, all of which prejudiced his co-defendant, and the court reversed the co-defendant's conviction and remanded for a new trial. *Id*. at 553-554. In our view the analogy to *Carruthers* is misplaced. Co-defendant Bracey's behavior at trial was in no way similar to the antics of the *pro se* defendant in *Carruthers*. The Defendant is not entitled to relief as to this issue.

## C. State's Theories of Prosecution

As the Defendant's final issue, he argues that the trial court erred when it allowed the prosecution to present inconsistent theories at trial. He asserts that the testimony of the witnesses conflicted with the Defendant's police statement, which created "an alternative theory of the case." He contends that it was "inappropriate for both theories to be put to the jury" thereby violating the Defendant's due process rights. The State responds that the Defendant never objected to the State's presentation of the evidence at trial and, therefore, has waived review. We agree with the State. After review of the record, we conclude that this issue has been waived because the Defendant failed to object to this testimony at trial. Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party . . . who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error").

## III. Conclusion

Based upon the foregoing reasoning and authorities, the trial court's judgments are affirmed.

_____
ROBERT W. WEDEMEYER, JUDGE